### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| In re | |
|---|---|
| FRANCES J. DARDEN, | Chapter 7 |
| | Case No. 07-10474 |
| Debtor | |

### MEMORANDUM OF DECISION

**I.    INTRODUCTION**

The matters before the Court are (1) the motion of Carolyn A. Bankowski, the Chapter 13 trustee (the "Trustee") for Turnover of Settlement Funds, (2) the Trustee's Motion to Dismiss, and (3) the Motion to Dismiss filed by the Debtor, Frances J. Darden. As these matters concern the administration of this case and the disposition of property of the estate, they are core proceedings over which this Court has jurisdiction to enter final orders and judgments. 28 U.S.C. § 157(b)(1), (b)(2)(A) and (E).

**II.    FACTS**

On January 26, 2007, the Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code.[1] At the time she owned, and she continues to own, the real property located at 374 Harvard Street, Dorchester, Massachusetts (the "Property"). The Property is encumbered by a first mortgage held by Fremont Investment & Loan ("Fremont") and, at the time of filing, a second mortgage that the Debtor believed was held by GMAC. On her Schedule B, the schedule of personal property she filed in her bankruptcy case, the Debtor listed claims against Fremont and GMAC under the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A, the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws Ch. 140D,

---
[1] 11 U.S.C. § 101 *et seq.*

("MCCCDA"), and the common law for fraud. The Debtor commenced an action against Fremont and GMAC and the related mortgage broker and real estate agent on May 2, 2007 in Massachusetts Superior Court to prosecute these claims (the "State Court Action").[2]

At the time of her bankruptcy filing, the Debtor reported unsecured prepetition debts of $65,515. By June 14, 2007 (the deadline for creditors to file proofs of claim), her unsecured creditors had filed claims against her estate totaling $45,359.73. Of this sum, $35,337.84 was for nondischargeable student loan debt. The balance was for three claims totaling $10,021.89 for credit card debt and unsecured loans.

The Debtor's schedules of income and expenses reflected a monthly net income of $2,094 with which to fund a plan. On April 23, 2007, she proposed a plan (the "2008 Plan").[3] In Section I of the 2008 Plan, setting forth the treatment of secured claims, the Debtor listed the secured claims of Fremont and GMAC but noted that she had rescinded the mortgages securing those claims and referenced the State Court Action. The 2008 Plan stated, "[t]he damages collected from this litigation will be paid toward these claims upon collection as a balloon payment to unsecureds." Under Section III, setting forth the treatment of unsecured claims, the Debtor listed general unsecured claims of $65,515 and an additional $479,027.68 in unsecured claims "arising after lien avoidance/cramdown" of the Fremont and GMAC mortgage claims. The 2008 Plan promised the general unsecured creditors dividends of twenty percent of their claims through plan payments "and a balloon payment upon receipt of litigation proceeds of up to 100% of their claim amounts." In Section IV, entitled "OTHER PROVISIONS," the Debtor reiterated her intention to sue Fremont and GMAC and repeated the language of Section I that "damages collected from this litigation will be paid toward these claims upon collection as a balloon payment to unsecureds." The Court entered an order confirming the 2008 Plan on May 30, 2008 and setting its

---

[2] The action is captioned Darden v. Noyes et. al., Civil Action No. 07-1909D.

[3] The Debtor's original plan, submitted on February 28, 2007 proposed a monthly payment of $2,034. The plan as amended in April, 2007 changed the monthly payment to $2,094 but was otherwise identical to the original plan.

effective date at March 1, 2007. The Confirmation Order stated the Debtor would make six monthly payments of $2,094 and that "on or before the 60th month of the Plan, the Debtor shall pay the Trustee a lump sum payment in the amount of $484,038.00 or such sum as is necessary to complete the Plan from litigation proceeds."

On January 7, 2010 the Trustee requested a conference on the status of the State Court Action. By that point she had already paid a twenty percent dividend to unsecured creditors per the terms of the 2008 Plan and was holding an additional $47,024 in plan payments.[4] However, because the 2008 Plan contemplated a balloon payment upon receipt of litigation proceeds to pay up to an additional eighty percent of claims, the Trustee argued she could not disburse the money she held until the litigation was resolved or until the Debtor filed an amended plan. In a letter to the Court dated March 23, 2010, Debtor's counsel reported that two developments in the State Court Action—a recent admission by GMAC that it had never owned the Debtor's second mortgage, and Fremont's assignment of its first mortgage to a third party—had forced the Debtor to amend her complaint to include the current actual owners of her two mortgages. Counsel concluded that this amendment, in conjunction with numerous outstanding discovery issues and pending cross-motions for partial summary judgment, may very well cause substantial delay in the Action.

On the basis of GMAC's admission that it had never owned the Debtor's second mortgage, this Court granted the Debtor leave to file a late objection to GMAC's proof of claim in the spring of 2010. In her objection, the Debtor included a request that this Court sanction GMAC on the basis that, in an earlier motion for relief from stay, GMAC had falsely represented that it owned the Debtor's second mortgage.

On June 29, 2010, the Trustee filed a motion to dismiss the Debtor's bankruptcy case because the Debtor had fallen behind in payments under the 2008 Plan. In response, the Debtor explained that,

---

[4] Where the Confirmation Order required the Debtor to make only six payments of $2,094 (for a total of $12,564), it is unclear why she continued to remit payments to the Trustee.

3

due to a loss of foster care and a reduction in rental income, her monthly disposable income had dropped considerably. She filed an amended plan (the "Post-Confirmation Plan" or "Plan") that reduced her plan payment from $2,094 to $400 per month. The Trustee withdrew her motion to dismiss.

The Post-Confirmation Plan also reduced the amount of general unsecured claims to $45,359.73 and altered the language describing how the unsecured claims would be paid. The Post-Confirmation Plan retained the twenty percent dividend. However, where the 2008 Plan stated the general unsecured creditors would also receive "a balloon payment upon receipt of litigation proceeds of up to 100% of their claim amounts," the Post-Confirmation Plan changed this language to read "[g]eneral unsecured creditors will also receive a pro rata share of any nonexempt proceeds, if any, upon [Debtor's] receipt of said proceeds upon resolution of the litigation currently pending as mentioned in section 1A, above and IV(C) below." The referenced sections remain unchanged from the earlier confirmed plan. Notably, they retain the following language: "The damages collected from this litigation will be paid toward these claims upon collection as a balloon payment to unsecureds." The Court granted the Debtor's motion to amend the 2008 Plan without objection on September 21, 2010, making the Post-Confirmation Plan the effective plan, which it remains to this date.[5]

On June 10, 2011, the Debtor and GMAC filed a joint motion to approve a settlement (the "GMAC Settlement" or "Settlement"). Per the terms of the Settlement, GMAC would withdraw its proof of claim, release the Debtor from claims relating to the underlying mortgage transaction, and pay her $20,000. In exchange, the Debtor agreed to dismiss GMAC from the State Court Action with prejudice. The Debtor's counsel would hold the $20,000 in trust "pending resolution of the State Court Action." The Trustee objected to this provision of the Settlement, arguing that under the Post-Confirmation Plan, "any damages collected from the litigation with GMAC . . . are to be paid to the Trustee as a balloon

---

[5] Although the Trustee never submitted an Amended Confirmation Order, the Post-Confirmation Plan became legally binding on the Debtor and each of her creditors when the Court allowed her motion to amend. *See* 11 U.S.C. § 1329(b)(2) ("The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.").

4

payment to the general unsecured creditors." The Court approved the Settlement on July 7, 2011 and stated, "[t]he Trustee has asked for an order regarding disposition of the proceeds, but that issue is beyond the scope of the present motion and was raised in a response, a pleading to which no response is required; therefore, the request for an order of turnover is denied without prejudice."

In February, 2012, the Plan entered its fifty-ninth month. The Trustee requested a conference on the status of the State Court Action, noting that per the terms of the Post-Confirmation Plan, she was expecting litigation proceeds to effectuate any additional distribution to the unsecured creditors. The Court held a status conference on March 1, 2012. Counsel for the Debtor told the Court that the Debtor had resolved all claims with GMAC, that Fremont had assigned its mortgage loan to HSBC as Trustee for the Fremont Home Loan Trust 2005-A (the "Fremont/HSBC Mortgage"), and that the Superior Court had allowed the Debtor's motion for partial summary judgment, concluding that the Fremont/HSBC Mortgage violated the MCCCDA. Counsel indicated that he expected that, following hearings scheduled for June 14, 2012, the Debtor would be in position to seek an order rescinding or voiding the Fremont/HSBC Mortgage entirely, at which point there would be funds to pay a 100% dividend on all unsecured claims. In the alternative, counsel noted that the Debtor might need to use the $20,000 to facilitate a settlement or loan modification agreement with Fremont. Finally, counsel noted that other claims against Fremont and the mortgage broker remained unresolved but would have no impact on the bankruptcy.

On March 2, 2012, the Trustee filed a motion for turnover of the GMAC Settlement proceeds and a motion to dismiss the bankruptcy case, two of the three matters presently before the court. In her motion for turnover, the Trustee argues that pursuant to the terms of the Post-Confirmation Plan, the amount of $20,000 must be turned over to the Trustee to be paid to the general unsecured creditors. In her motion to dismiss, the Trustee argues that dismissal was warranted because the Plan

5

expired by its terms on March 1, 2012 without any balloon payment from the Debtor and therefore that the Debtor is in material default of the terms of the Plan.

On March 15, 2012, the Debtor filed her own motion to dismiss pursuant to 11 U.S.C. § 1307(b). In response to the Trustee's motion for turnover of the GMAC Settlement proceeds, the Debtor argues that the language in the Post-Confirmation Plan does not guarantee a balloon payment to unsecured creditors. Specifically, the Debtor interprets the Post-Confirmation Plan to provide "a payment in excess of 20% only if the State Court Action rescinds her mortgage loans, and results in damages more than sufficient to address her remaining purported mortgage creditor's rights, *if any*, as an unsecured creditor."[7] Moreover, the Court-approved GMAC Settlement provided that the Debtor's counsel would retain the $20,000 Settlement proceeds pending resolution of the State Court Action. The Debtor argues that since the status of the Fremont/HSBC Mortgage remains unresolved, she has no present obligation to turn the proceeds of the GMAC Settlement over to the Trustee. Furthermore, the Debtor argues that dismissal of her case, which the Court must grant as a matter of right, would, by operation of 11 U.S.C. § 349(b)(3), automatically revest the Settlement proceeds in the Debtor.

In her response to the Debtor's motion to dismiss, the Trustee reports that she is currently holding $63,024.42 in undisbursed funds. Because the confirmed plan specifically states that the unsecured creditors are to receive a balloon payment as a result of the litigation, the Trustee argues, she cannot disburse the remaining funds to creditors without further order from this Court. To this, the Debtor replies that § 349(b)(3) of the Bankruptcy Code revests ownership of all undisbursed payments in the Debtor.

On May 3, 2012, the Court held a hearing on the Trustee's Motion for Turnover of Settlement Funds and the motions to dismiss of the Trustee and the Debtor. The Trustee takes the position that the $20,000 of GMAC Settlement proceeds are property of the estate and ought to be turned over to her for

---

[7] *See Supplemental Opposition to Trustee's Motion for Turnover*, Docket #249, ¶ 12.

6

distribution to the unsecured creditors per the terms of the Post-Confirmation Plan. The Trustee also argues the Debtor is not entitled to a refund of the $63,324.42 in undistributed plan payments. If she were authorized to distribute the money she currently holds, the Trustee concludes she could pay 100% of the liquidated unsecured claims.[8] The Debtor reiterated the positions taken in her response to the Trustee's Motion for Turnover and Motion to Dismiss: that all property revests in the Debtor upon dismissal, and the terms of the Post-Confirmation Plan do not oblige her to turn over the GMAC Settlement proceeds.[9] This result is equitable, argues the Debtor, because she will exit bankruptcy without a discharge, which would permit her creditors to exercise their rights against her at state law.

### III.     ANALYSIS

When, as in this instance, a case has not previously been converted under section 706, 1112, or 1208 of the Bankruptcy Code, § 1307(b) gives a debtor an absolute right of dismissal. 11 U.S.C. § 1307(b). Accordingly, the Court will enter an order granting the Debtor's motion to dismiss. However, the Court must first decide what shall become of the GMAC Settlement proceeds and the $63,024.42 of undisbursed plan payments upon dismissal of the case. The Trustee maintains that both are property of the estate and subject to distribution under the terms of the Post-Confirmation Plan. The Debtor responds with two arguments, one statutory and one based on the language of her Plan. The Debtor's statutory argument hinges on 11 U.S.C. § 349(b)(3), which provides for the revesting of certain property in the debtor upon dismissal of the bankruptcy. I shall deal with this argument first.

---

[8] In other words, the Trustee could effectuate a distribution to all unsecured creditors other than Fremont, which could potentially realize an unsecured claim pending resolution of the State Court Action.

[9] At the May 3, 2012 hearing, counsel for the Debtor again indicated that it may be necessary for the Debtor to pay the GMAC Settlement proceeds over to Fremont in order to allow her to retain the Property.

7

**A. The Effect of Dismissal on the Debtor's Claim to the GMAC Settlement Proceeds and Any Undisbursed Plan Payments**

Based on my reading of the relevant Bankruptcy Code sections, I conclude that dismissal of the Chapter 13 case does not give the Debtor an absolute right to recover the GMAC Settlement proceeds and the undisbursed plan payments.

First, the GMAC Settlement proceeds are property of the estate. Section 1306(a)(1) of the Code defines property of the estate in a Chapter 13 case to include all property specified in § 541 that a debtor acquires during the course of her bankruptcy case. 11 U.S.C. § 1306(a)(1). Subject to exceptions not applicable here, § 541(a)(1) captures for the estate all legal or equitable interests of the debtor in property. 11 U.S.C. § 541(a)(1). Under the terms of the Settlement, GMAC paid $20,000 "for the benefit of [the Debtor,] [which] shall be held in trust by [the Debtor's] attorney." At the March 1, 2012 hearing, Debtor's counsel confirmed that his firm currently held this money. Because the Debtor acquired a legal and/or equitable interest in this sum during the court of her bankruptcy case, the $20,000 of GMAC Settlement proceeds is property of the estate.[10]

Second, the Debtor's reading of the § 349(b)(3) revesting provision is incomplete. The entirety of the Section reads:

> Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title— . . .
> (3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

11 U.S.C. § 349(b)(3). While § 349(b)(3) provides a default mechanism for returning property of the estate to the debtor upon dismissal, the court retains the power to "order otherwise." Therefore, although the Debtor has the right to dismiss her case under § 1307(b), she does not have an absolute right to the GMAC Settlement proceeds upon her doing so.

---

[10] This is so even though Debtor's counsel holds the money. Nothing in Section 541 or 1306 requires that property of the estate be held by the debtor as opposed to the trustee or her agents.

Nor does § 349(b)(3) revest the $63,024.42 in undisbursed plan payments in the Debtor. *See In re Parrish*, 275 B.R. 424, 426 (Bankr. D.D.C. 2002) (holding that § 349(b)(3) does not upon dismissal revest in the debtor payments made under a confirmed plan). Assuming the plan payments constitute property of the estate,[11] § 349(b)(3) must be read in conjunction with § 1326(a)(2). *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626 (1988) ("Statutory construction . . . is a holistic endeavor" where isolated provisions ought to be interpreted to produce "a substantive effect that is compatible with the rest of the law."). Section 1326(a)(2) tells the Trustee what she is to do with plan payments: "If a plan is confirmed, the trustee shall distribute any such payment in accordance with the plan as soon as practicable." 11 U.S.C. § 1326(a)(2). This directive is not contingent on who holds title to the funds or on whether or not the case has been dismissed. *See Parrish*, 275 B.R. at 427. While 11 U.S.C. § 349(b)(2) states that dismissal of a case has the effect of vacating certain orders, it does not list orders confirming Chapter 13 plans among those vacated by dismissal. In *Parrish*, the bankruptcy court noted that a dismissal *implicitly* vacates a confirmation order with respect to a debtor's obligation to make future payments. But the court noted there was a meaningful difference between future payments required and past payments made but undisbursed during the pendency of the bankruptcy:

> [I]f dismissal vacated the confirmation order as to past plan payments, creditors [anticipating the debtor's motion to dismiss] could rightfully require daily distributions of funds held by the trustee under a confirmed plan, an administrative nightmare that Congress could not have intended. The debtor should not have both the benefit of creditors' enforced collection rights having been stayed by reason of a confirmed plan, and the right to receive undisbursed plan funds on dismissal. Congress could not have intended such an inequitable result.

*See id.* at 432.

Finally, § 349(b)(3) revests property of the estate "in the entity in which such property was vested immediately before the commencement of the case." The Debtor's cause of action for sanctions

---

[11] Some courts have found that funds vest in the creditors once the debtor voluntarily remits payments to the trustee under a confirmed plan. *See e.g., In re Verdunn*, 210 B.R. 621, 626 (Bankr. M.D. Fla. 1997).

9

stemmed from GMAC's post-petition conduct and, therefore, did not exist before the commencement of the case. It was not then vested in anyone. Insofar as the Settlement proceeds represent the value of this postpetition cause of action, § 349(b)(3) says nothing about how or in whom the proceeds are to be vested. Accordingly, in light of the text of § 349(b)(3) and the bankruptcy court's analysis in *Parrish*, I conclude that dismissal of the Debtor's case does not, by itself, give her a claim to the GMAC Settlement proceeds or any undisbursed plan payments.

      **B.   The Effect of the Post-Confirmation Plan on the Debtor's Claim to the GMAC Settlement Proceeds and Any Undisbursed Plan Payments**

In addition to her statutory argument based on § 349(b)(3), the Debtor argues that the terms of the Post-Confirmation Plan entitle her to recover the undisbursed plan payments and retain the GMAC Settlement proceeds. Before examining the Plan to determine the scope and meaning of its provisions, it is helpful to consider the legal framework in which the provisions operate. *See In re Stuart*, 402 B.R. 111, 121 (Bankr. E.D. Pa. 2009). The Bankruptcy Code requires that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1329(a)(3). The term "good faith" is undefined but is generally interpreted to mean that there exists "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Sentinel Mgmt. Group, Inc. ("Sentinel")*, 398 B.R. 281, 315-16 (Bankr. N.D. Ill. 2008) (internal citations omitted).

The provisions of a confirmed plan bind the debtor and each creditor. *See* 11 U.S.C. § 1327(a). A confirmed Chapter 13 plan is treated as a binding contract between a debtor and her creditors, *see In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000); accordingly, I must apply general principles of contract interpretation to determine the parties' rights as they are set forth in the plan. *See In re Sims*, 358 B.R. 217, 223-24 (Bankr. E.D. Pa. 2006). Furthermore, as the party representing the interests of the general unsecured creditors, I consider the Trustee a party to the "contract." This characterization is supported

10

by the Code itself, as the terms of a confirmed plan dictate how the Trustee distributes payments. *See* 11 U.S.C. § 1326(a)(2). Therefore, I must ultimately determine the rights of the Debtor and the Trustee to the $63,024.42 of undisbursed plan payments and the GMAC Settlement proceeds according to the terms of the Post-Confirmation Plan mindful of the objectives and purposes of the Bankruptcy Code. *See In re Sentinel*, 398 B.R. at 315.

### 1. The Undisbursed Plan Payments

The Post-Confirmation Plan states, "[t]he general unsecured creditors who have filed proofs of claims shall receive 20% through the plan payments toward their unsecured claims." This language is unambiguous. It limits the amount the Trustee may distribute to general unsecured creditors via plan payments to twenty percent of their allowed claims. A "PLAN PAYMENT" is described in the Post-Confirmation Plan as a monthly payment of $400.[12] A "BALLOON PAYMENT" is described in Sections IA and IV(C) as "[t]he damages collected from this litigation." The Trustee has repeatedly stated in her pleadings and in open court that she has already distributed a twenty percent dividend to unsecured creditors from plan payments previously received during the bankruptcy case. Nothing in the Plan authorizes the Trustee to distribute additional plan payments once the twenty-percent dividend is achieved. Accordingly, since the Post-Confirmation Plan expressly limits the disbursement of plan payments to twenty percent of allowed claims filed by the general unsecured creditors, the Trustee has no authority under the Code to distribute the $63,024.42 she is currently holding, and the value of these funds must be returned to the Debtor.

### 2. The GMAC Settlement Proceeds

The Post-Confirmation Plan contemplates that the Debtor will make, in addition to plan payments through which a twenty-percent dividend would be funded, a "Balloon Payment" on or before

---

[12] The "plan payment" was similarly defined in the 2008 Plan as a monthly payment of $2,094.

the sixtieth month.  Section III of the Post-Confirmation Plan specifies how and when this balloon payment is to be disbursed.  General unsecured creditors "will also receive a pro rata share of any nonexempt proceeds, if any, upon debtor's receipt of said proceeds upon resolution of the litigation currently pending as mentioned in sections 1A, above and IV(C) below."  In her *Supplemental Opposition to Trustee's Motion for Turnover*, the Debtor argues that this provision prevents turnover of the GMAC Settlement proceeds because a proper reading of the language has the general unsecured creditors receiving more than their twenty-percent dividend "***only*** in the event that Debtor is successful in her litigation against her mortgage creditors ***and*** obtains an award of damages above and beyond the entitlement—***if any***—of such mortgage creditors to payment of a dividend as unsecured creditors themselves."  (Emphasis in original.)  The Debtor's argument is based on her interpretation of the phrase "resolution of the litigation" as it appears in Section III of the Plan.  At the May 3, 2012 hearing the Debtor argued that this phrase refers to a final resolution of *all her claims* against *all defendants* in the State Court Action.  Even though the Debtor has resolved the litigation as it pertains to GMAC by dismissing all her claims against it with prejudice, the general unsecured creditors do not yet have a right to receive the GMAC Settlement proceeds, the Debtor argues, because the litigation over the Fremont/HSBC Mortgage continues.

A careful reading of the Post-Confirmation Plan as a whole does not support the Debtor's argument.  The Post-Confirmation Plan functions as a contract setting forth the terms upon which the Debtor's relationship with her creditors is to be restructured, and my function in this case is to "interpret the contract's terms[] in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning."  Richard A. Lord, 11 *Williston on Contracts* § 30:7 (4th ed.).  Where the terms of a writing are plain and unambiguous, there is no room for interpretation or construction.  *Id.* § 30:4.  A contract is ambiguous if a genuine doubt appears as to

12

its meaning, that is, if, after applying established rules of interpretation, the written instrument remains reasonably susceptible to at least two reasonable but conflicting meanings. *Id.*

Reading the text of the Post-Confirmation Plan, I cannot find that it contains the conditions precedent to distribution for which the Debtor argues. Section III says that the general unsecured creditors will receive their distribution of proceeds upon resolution of the litigation. Viewing the Post-Confirmation Plan as a whole, Section III is unambiguous. It entitles general unsecured creditors to a pro rata share of the GMAC Settlement proceeds upon the occurrence of (1) the Debtor's receipt of said proceeds and (2) the resolution of her litigation against GMAC. The Debtor's reading of the phrase "resolution of the litigation" to make resolution of the dispute concerning the Fremont/HSBC Mortgage a predicate to distribution of the GMAC Settlement proceeds is inconsistent with the Plan as a whole.

The Plan promises the general unsecured creditors a pro rata share of litigation proceeds "upon resolution of the litigation currently pending as mentioned in section 1A, above and IV(C) below." Sections 1A and IV(C) are identical. They read in their entirety:

> Debtor has rescinded the secured status of her mortgage loans and has filed litigation against each of her lenders as well as the corresponding mortgage broker and real estate agent to secure damages for violation of the Mass G.L. c. 93A, TILA the MCCCDA and under common law for fraud and unfair and deceptive mortgage practices. The Attorney General for the Commonwealth has already commenced litigation against the mortgage brokers involved in these very loans. **The damages collected from this litigation will be paid toward these claims upon collection as a balloon payment to unsecureds**. Debtor will file an amended Chapter 13 plan upon the resolution of the litigation dealing with mortgage creditors. (Emphasis added.)

The Debtor's interpretation of "resolution of the litigation" runs afoul of the above bolded language in the Plan, which clearly states that *any* damages recovered from the litigation are to be paid "upon collection." It does not say "upon collection and the resolution of litigation against all defendants." In this case, the Debtor received $20,000 in damages from GMAC and dismissed all claims against GMAC with prejudice in the summer of 2011. At this point the litigation with GMAC was resolved and the

Debtor became obligated to commit the Settlement proceeds to funding the Post-Confirmation Plan.[13] If Section III of the Plan allowed her to retain those moneys, perhaps for years, pending the final resolution of the parties' rights concerning the Fremont/HSBC Mortgage, the term "upon collection" would have no effect. Moreover, that interpretation might make it impossible to effectuate a "balloon payment" before the sixtieth month of the Plan term expired—which is exactly what happened in this case. Therefore, the only reasonable interpretation of the phrase "resolution of the litigation" as it appears in Section III of the Post-Confirmation Plan is that it refers to resolution of the Debtor's claims against any of the defendants, severally.

Alternatively, even if the phrase "resolution of the litigation" were susceptible to the reading the Debtor gives it, the Court's interpretation—that resolution of litigation as against any defendant would trigger a disbursement of any settlement proceeds—is equally plausible. Indeed, the Trustee took this view when she objected to the motion to approve the Settlement in June, 2011 and has reiterated it in her pleadings since. Therefore, if I deemed the Debtor's interpretation plausible, I would be faced with an ambiguity in the Plan, and this ambiguity I would be obligated to resolve against the Debtor. *See In re Brawders*, 325 B.R. 405, 411 (B.A.P. 9th Cir. 2005) ("[A] plan should clearly state its intended effect on a given issue. . . . [A]ny ambiguity is interpreted against the debtor").

Good faith, too, requires that the plan be so construed. As explained above, a plan will qualify for confirmation only if the Debtor proposes it in good faith. It follows that a confirmed plan should be construed as having been proposed in good faith and, consequently, that the court should not credit an interpretation of the plan that would have the debtor taking away with one hand what she appears to be giving with the other. The plan cannot both commit a recovery to payment of unsecured creditors *and* reserve to the Debtor the option of using it for other purposes.

---

[13] The Court notes that the terms of the GMAC Settlement direct the Debtor's counsel to hold the Settlement proceeds "pending resolution of the State Court Action." Whether this means the Debtor is to retain control over the Settlement proceeds through the final resolution of the Fremont litigation is irrelevant. The parties' rights are determined by the Post-Confirmation Plan, and the GMAC Settlement is not an amendment to that Plan.

For these reasons, the Post-Confirmation Plan must be construed as obligating the Debtor to turn over the GMAC Settlement proceeds to the Trustee for distribution to the general unsecured creditors. This amount shall include the $20,000 received from GMAC plus any accrued interest.

### C. Cause Exists Under 11 U.S.C. § 349(b) To Disburse the GMAC Settlement Proceeds to the General Unsecured Creditors

Although I find that the general unsecured creditors are entitled to a pro rata distribution of the GMAC Settlement proceeds under the terms of the Post-Confirmation Plan, I additionally conclude that cause exists under 11 U.S.C. § 349(b) to order such distribution notwithstanding dismissal of the case. As discussed above, the Settlement proceeds are property of the estate that, upon dismissal of the case, revest "in the entity in which such property was vested immediately before the commencement of the case" unless the Court "for cause, orders otherwise." 11 U.S.C. § 349(b)(3). Even if the proceeds were subject to this provision (notwithstanding that neither they, nor the cause of action that gave rise to them, existed before the commencement of the case) and the Debtor were deemed the entity in which such property was vested immediately before the commencement of the case, cause would and does exist to "order otherwise."

The Bankruptcy Code does not define "cause," leaving it to the bankruptcy courts to fashion equitable dispositions different from those that, unless the court "orders otherwise," would be dictated by § 349(b). The case of *In re Genovese* provides an example. *See* 91 B.R. 831 (Bankr. E.D. Tenn. 1988). There, an employer was sanctioned for violating the automatic stay in 11 U.S.C. § 362(a) when, instead of remitting a portion of the employee-debtor's wages to the Chapter 13 trustee for distribution under the plan, the employer kept the wages and applied them to satisfy debts owed to him personally. Finding the employer in contempt, the court ordered him to turn over $1,440 in misapplied wages to the trustee for distribution under the plan. After the debtors moved to dismiss their bankruptcy case, the employer cited § 349(b)(2) and argued that dismissal vacated the order sanctioning him and should also

15

require the trustee to return the $1,440. The court found "cause" to "order otherwise" and upheld the contempt order, noting that the employer should not be permitted to profit from his willful disregard of the court's order simply because the debtors had dismissed their case. *Id*. at 834.

Cause under § 349(b) may also arise in situations where a party has not acted in bad faith. Courts have also found cause in circumstances where, in view of the duration of the time in which the debtor enjoyed the benefit of the automatic stay, it would be inequitable to creditors to authorize dismissal without distribution of monies accumulated during the case for payment to them, the quid pro quo for their having suffered the effects of bankruptcy's automatic stay. *See In re Torres*, 2000 WL 1515170 at *2 (Bankr. D. Idaho Oct. 10, 2000); *In re Hufford*, 460 B.R. 172, 178 (Bankr. N.D. Ohio 2011). In *Torres*, the debtors' counsel took eight months to submit a proposed confirmation order due to a disagreement with the trustee over the arrearage owed to the first mortgage holder and counsel's conceded lack of diligence in pursuing the matter. *See* 2000 WL 1515170 at *2. When the debtors eventually worked out a loan modification agreement with the mortgage holder that would cure the arrears outside the plan, they moved to dismiss their bankruptcy case. *See id.* at *1. Though it granted their dismissal motion, the court found cause to order that the funds paid into the plan be distributed to the debtors' creditors. The court stated:

> While the Court attributes no manipulative intent to the Debtors here, the results of the delay are the same as those in cases where mischief is at work: Debtors received protection through the Bankruptcy Code for some ten months while their creditors received nothing. Under these circumstances, the interests of the creditors are at risk.

*Id.* at *3. Similarly, in *Hufford* the debtors were embroiled in a dispute with their mortgage holder over the size of its prepetition claim. *In re Huffard*, 460 B.R. at 174. In connection with this dispute, the trustee filed a motion to dismiss based on a lack of feasibility of their plan. The debtors objected to the trustee's motion, the adjudication of which was continued for nearly a year while the parties attempted to reach a settlement. Eventually the debtors withdrew their objection, effectively dismissing the case.

16

For cause under § 349(b), the court ordered that the funds paid into the chapter 13 plan would not revest in the debtors but instead be disbursed to their creditors.[15] *Id.* at 178.

I find there is cause under § 349(b) to order that the $20,000 of GMAC Settlement proceeds not be revested in the Debtor but instead be distributed through the Trustee to the general unsecured creditors. The Debtor filed this bankruptcy case on January 26, 2007. For more than five years, her creditors have been prevented by the automatic stay from vindicating their rights under state law. They received a twenty-percent dividend of their claims during the first year of the bankruptcy, but since at least January, 2010, they have received nothing. Meanwhile, the Debtor has continued to remit a portion of her postpetition income to the Chapter 13 trustee. Ironically, these "overpayments" by the Debtor, which the Plan's terms do not allow the Trustee to distribute, would more than satisfy 100% of the general unsecured creditors' claims. Because the Post-Confirmation Plan commits proceeds from the State Court Action to satisfy the Debtor's unsecured claims (regardless of when or under what conditions precedent the Debtor would argue for), I find cause to order distribution of the GMAC Settlement proceeds to the unsecured creditors in this case.

Five years of the automatic stay has helped the Debtor to prosecute her claims in the State Court Action and provided her additional relief in the bankruptcy court. The Debtor moved to sanction GMAC within the bankruptcy proceeding, which eventually resulted in a complete resolution of GMAC's involvement in both the bankruptcy case and the State Court Action. While it is possible the Debtor could have recovered nothing from GMAC and the other defendants during the pendency of her bankruptcy, the fact remains that she received $20,000 during the period of respite afforded by the automatic stay.

The Debtor argues that unforeseen problems beyond her control extended the State Court Action, which is now in its sixth year. Yet it is cold comfort to her creditors that, five years later, she

---

[15] The court also found authority under § 1326(a)(2) to order the trustee to disburse the funds she was holding. *See* 460 B.R. at 176.

17

stands a good chance of prevailing against her mortgage lender. When asked at the May 3, 2012 hearing whether the Debtor planned to use the undisbursed plan payments and GMAC Settlement proceeds to pay her unsecured creditors, Debtor's counsel was equivocal, commenting on several occasions that the Debtor may use the money to reach a loan modification agreement with Fremont/HSBC. If she were to do so, hope of a balloon payment would vanish. The unsecured creditors would find themselves, five years later, back at square one to pursue their remedies under state law. Although the Debtor sees this as fair because those debts will not be discharged, the Bankruptcy Code should not tolerate such an inequitable result. In exchange for five years of bankruptcy protection, during which time all creditors were stayed from taking collection action against her, the Debtor promised a twenty-percent dividend and the proceeds, if any, from the State Court Action. "The plan payments (and the creditors' right to receive them under the confirmed plan's terms) were the price of the debtor's obtaining a stay of collection by way of the confirmed plan. Dismissal does not free the debtor of that price." *Parrish*, 275 B.R. at 432.

    IV.    **CONCLUSION**

For the foregoing reasons, the Court will, by entry of a separate order, grant the Trustee's Motion for Turnover of the $20,000 of GMAC Settlement Proceeds, grant the Debtor's Motion to Dismiss, and declare moot the Trustee's Motion to Dismiss. Since the Trustee is currently holding an amount in excess of the GMAC Settlement proceeds, she is hereby authorized to distribute $20,000 plus any interest accrued on the Settlement proceeds while in the Debtor's possession thereof to the general unsecured claims, inclusive of her commission, and is further ordered to remit any remaining funds to the Debtor.

Date: May 25, 2012

                                                     /s/ Frank J. Bailey
                                            Frank J. Bailey
                                            United States Bankruptcy Judge